UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| JEAN WALL and STEVEN WALL, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Civil Action No. |
| JACK & THE GREEN SPROUTS, INC., a Wisconsin Corporation, | ) ) ) ) | |
| Defendant. | ) ) | |

**COMPLAINT AND JURY DEMAND**

Plaintiffs Jean Wall and Steven Wall, by and through their undersigned counsel, OFT Law PLLC, submit this Complaint and Demand for Jury Trial against Jack & the Green Sprouts, Inc., and allege the following upon personal knowledge and belief, and investigation of counsel:

**NATURE OF THE ACTION**

1. In the past decade, Jack & the Green Sprouts has issued three recalls for its sprouts because of potential pathogen contamination: once for *E. coli* O157 and twice for *Listeria monocytogenes*.

2. After the second recall, when the Food and Drug Administration (FDA) inspected Jack & the Green Sprouts, this storied recall history made sense: the FDA found a facility that was a haven for *Listeria* and rodents alike.

3. Despite the insanitary conditions within the Jack & the Green Sprouts production facilities, consumers believed they were buying wholesome, healthy and safe sprouts from a family-owned business.

4.     Plaintiff Jean Wall was one of those consumers. She purchased and consumed Jack & the Green Sprouts in the fall of 2024. Those sprouts yet again proved to be grossly contaminated with *Listeria monocytogenes* and caused Plaintiff Jean Wall to suffer a life-threatening listeriosis infection.

## PARTIES

5.     Plaintiff Jean Wall resides in Delhi, Iowa, and is a citizen of the State of Iowa.

6.     Plaintiff Steven Wall resides in Delhi, Iowa, and is a citizen of the State of Iowa.

7.     Defendant Jack & the Green Sprouts, Inc. ("Jack & the Green Sprouts"), is a Wisconsin Corporation with its principal place of business and corporate headquarters at N8477 770th Street, River Falls, Wisconsin, 54022.

8.     Defendant Jack & the Green Sprouts is therefore a citizen of the State of Wisconsin.

9.     Upon information and belief, Defendant Jack & the Green Sprouts was in the business of manufacturing, marketing, distributing, and selling its alfalfa sprouts throughout the United States.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy greatly exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiffs and Defendant. More specifically, Plaintiffs Jean Wall and Steven Wall are citizens of Iowa while Defendant Jack & the Green Sprouts is a citizen of Wisconsin for diversity purposes.

11.     Venue is proper in The United States District Court for the Western District of Wisconsin pursuant to 28 U.S.C. § 1391(a) and (b) because Defendant Jack & the Green Sprouts resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

### *Listeria monocytogenes* and Hydroponic Growing Systems

2

12. Listeriosis is a serious illness resulting from consumption of food contaminated with the bacteria *Listeria monocytogenes*.

13. With a fatality rate of over twenty percent, *Listeria monocytogenes* is one of the most virulent and deadly foodborne pathogens. Virtually all people who contract invasive listeriosis require hospitalization. Those who are elderly, immune-compromised, or pregnant are particularly vulnerable.

14. *Listeria monocytogenes* tends to thrive in food processing environments, particularly in floor drains and other cool damp areas. *Listeria monocytogenes* can easily be transferred from one area of a processing facility to another through, for example, simple touching of equipment, water, mist, or by way of workers' clothes, shoes, or hands.

15. In hydroponic cultivation systems—which, upon information and belief, Jack & the Green Sprouts used to produce its alfalfa sprouts—the risk of contamination by *Listeria monocytogenes* and other pathogens is especially high.

16. Within a hydroponic cultivation system, the crop is constantly exposed to a nutrient solution, which provides both sustenance for the crop and a seamless pathogen transmission route. Once a pathogen enters the nutrient solution system, it can cross-contaminate the edible parts of the plant and spread across the entire growing system, contaminating other plants along the way.

17. The growing plants themselves also act as accelerants: rather than release plant exudates (organic compounds released by roots) into soil, the exudates circulate in the nutrient solution, acting as mobile, fertile environments for bacteria to multiply and form biofilms.

18. One benefit of the hydroponic system is year-long, rather than strictly seasonal, production. But that benefit bears a sanitation risk: there may be fewer "clean breaks" during production, giving pathogens more opportunity to form biofilms and establish themselves across the hydroponic system.

19. Given the unique contamination risks to hydroponic systems, responsible hydroponic growers implement various interventions to prevent, control, or eliminate pathogens within the hydroponic system. This includes, among other interventions, thorough environmental testing for pathogens. Responsible growers also verify that those interventions are effective.

20. These safety steps are especially critical for hydroponic growers of sprouts. Sprouts present additional contamination risks because they require humidity and warmth to grow—the same conditions that promote rapid growth of foodborne pathogens like *Salmonella*, *Listeria*, and *E. coli*. Ignoring these risks and failing to adequately adopt and follow a food safety program will cause these pathogens to colonize a food-processing environment, contaminate finished product and cause human illnesses, exactly as occurred in this case.

### *Listeria monocytogenes* Outbreak Linked to Jack & the Green Sprouts

21. In mid-September of 2024, the Minnesota Department of Agriculture (MDA) conducted routine testing on alfalfa sprouts grown and packed by Jack & the Green Sprouts collected from a retailer in International Falls, Minnesota. The alfalfa sprouts tested positive for *Listeria monocytogenes*.

22. Public health officials then used a genetic subtyping process known as Whole Genome Sequencing (WGS) to identify the unique "fingerprint" of the *Listeria monocytogenes* found in the Jack & the Green Sprouts alfalfa sprouts. That unique "fingerprint" was then uploaded into a national database used to determine whether human illnesses were caused by a common strain of *Listeria monocytogenes*.

23. On October 4, 2024, after receiving notice of the positive *Listeria monocytogenes* sample, Jack & the Green Sprouts recalled its five-ounce packages of alfalfa sprouts, and its alfalfa and onion sprouts.

24.    At first, no human illnesses matched the outbreak strain. But on October 7, 2024, three days after the recall, the Minnesota Department of Health (MDH) learned that the *Listeria monocytogenes* strain found in the Jack & the Green Sprouts alfalfa sprouts was a WGS match to the strain found in the blood of an Iowa resident—Plaintiff Jean Wall.

25.    Soon, public health officials identified three additional human cases that were a WGS match to the *Listeria monocytogenes* strain found in the Jack & the Green Sprouts alfalfa sprouts.

26.    The epidemiological evidence also pointed directly to the sprouts as the source of illness. All four cases reported eating sprouts before becoming ill, with three cases remembering the brand name: Jack & the Green Sprouts.

27.    On October 9, 2024, through October 21, 2024, the U.S. Food and Drug Administration (FDA) conducted an inspection of the Jack & the Green Sprouts growing facility. Following the inspection, the FDA issued Jack & the Green Sprouts a Form FDA 483, but, upon information and belief, the FDA initially never received a response.

28.    The 2024 recall was not Jack & the Green Sprouts' first. In 2016, Jack & the Green Sprouts recalled its alfalfa sprouts after they were linked to eleven *E. coli* O157:H7 illnesses across Minnesota and Wisconsin.

29.    Thus, by 2024, Jack & the Green Sprouts had actual knowledge that its hydroponic growing system was susceptible to contamination by foodborne pathogens. Despite the 2016 outbreak, Defendant Jack & the Green Sprouts failed to fortify its hydroponic system against foodborne pathogens, including *Listeria monocytogenes*. And it failed to do so a second time after the 2024 outbreak.

30.    On February 3, 2025, nearly four months after the recall in 2024, yet another sample of Jack & the Green Sprouts brand alfalfa sprouts tested positive for *Listeria monocytogenes* during routine sampling at the retail level.

31.     Further investigation revealed the 2025 sample of *Listeria monocytogenes* was closely related by WGS to the 2024 samples, both product and human illnesses. Once again, Jack & the Green Sprouts recalled packages of its alfalfa sprouts.

32.     This repeat product-positive shows that the facility suffered from longstanding *Listeria* colonization.  Even after the recall the company proved unwilling or unable to eradicate its *Listeria* infestation.

33.     Recognizing the risks to public health posed by Defendant's facility, FDA issued Jack & the Green Sprouts a Warning Letter on March 19, 2025, a serious escalation by the FDA.

34.     During its inspections of Jack & the Green Sprouts, the FDA observed a "significant violation of the Produce Safety regulation, 21 CFR Part 112" that directly compromised the safety of the sprouts: "Your environmental monitoring plan does not include a sampling plan that specifies a sufficient number of sampling sites to determine whether measures are effective as required by 21 CFR 112.145(c)(3)."

35.     When Jack & the Green Sprouts finally increased its environmental samples to an acceptable level, they found *Listeria* species on both food contact and non-food contact surfaces, including *after* those surfaces were apparently cleaned—proof that Defendant's longstanding food safety failures allowed a *Listeria* colonization of its facility.

36.     Additionally, the FDA observed significant evidence of rodent activity: fur and a small skull were found on the floor; the investigators observed gnaw holes, staining, and chewed material; they also noticed rodent excrement on bags of garbanzo beans, green peas, and lentils.

37.     Thus, even after multiple recalls and investigations, Defendant's facilities were a breeding ground for *Listeria* and human illnesses were all but inevitable.

### Ms. Wall's *Listeria monocytogenes* Exposure and Illness

38.     In late August or early September 2024, Ms. Wall purchased groceries from the Hy-Vee grocery store located at 2395 NW Arterial in Dubuque, Iowa.

39.     During this shopping trip, Ms. Wall purchased Jack & the Green Sprouts brand alfalfa sprouts, which she routinely used on sandwiches she prepared at home.

40.     Soon after her purchase, Ms. Wall ate the Jack & the Green Sprouts brand alfalfa sprouts.

41.     On or about September 7, 2024, several days after eating the sprouts, Ms. Wall developed a severe headache and a high fever.

42.     Over the next few days, Ms. Wall's symptoms intensified. Her body ached, her throat was sore, and her blood pressure spiked. She also developed diarrhea, experiencing profuse episodes throughout the days.

43.     Then, Ms. Wall developed neurological symptoms. She became increasingly confused, grasping for memories and struggling to recall events that occurred only hours before. Her movements became slow and unsteady, as though her limbs were weighted down.

44.     On or about September 14, 2024, Ms. Wall sought medical care at an urgent care clinic in Cedar Rapids, Iowa.

45.     At first, believing the cause of Ms. Wall's condition was an ordinary virus, Ms. Wall's doctor tested her for numerous viral illnesses and then sent her home with strict return instructions.

46.     The next day, Ms. Wall's condition worsened. She called her gastroenterologist, wondering if she should delay a critical treatment for her Crohn's disease. After reviewing Ms. Wall's symptoms, her gastroenterologist concluded delaying the treatment was best, as the treatment could further suppress her compromised immune system, worsening the ongoing infectious process.

47.     By September 16, 2024, Ms. Wall was worse still. She sought care at the Regional Medical Center in Manchester, Iowa. She reported ongoing fevers and rampant diarrhea.

48.     To combat Ms. Wall's fluid loss, her care team ordered an IV. They also collected and tested a sample of Ms. Wall's stool. After determining Ms. Wall was stable enough to return home, her doctor discharged her to await her test results.

49.     The following day, Ms. Wall received a call from her care team instructing her to go to the nearest emergency department: her blood cultures were positive for Gram-positive bacteria, a result suggesting a potential *Listeria monocytogenes* infection. Ms. Wall headed straight to the emergency department at Mayo Clinic in Rochester.

50.     At the Mayo Clinic emergency department, Ms. Wall reported the intensity of her bowel movements had increased substantially. The emergency department doctor ordered additional blood cultures and prescribed an antibiotic. He provided Ms. Wall with strict return precautions and discharged her.

51.     The morning of September 18, 2024, Ms. Wall received another call: her second set of blood cultures were also positive for gram-positive bacteria. She was instructed to returned to the emergency room. Ms. Wall soon learned that her blood cultures were positive for *Listeria monocytogenes*.

52.     On September 18, 2024, Ms. Wall was admitted to the hospital. She was immediately started on IV antibiotics.

53.     The following day, an infectious disease doctor evaluated Ms. Wall. Given Ms. Wall's immunocompromised state, headaches, photosensitivity, and altered mental status, the infectious disease doctor ordered a lumbar puncture.

54.     Although her meningitis panel was negative, her doctors noted that elevated protein levels and lymphocytosis suggested prior central nervous system involvement. Put differently, Ms. Wall's doctors found evidence that *Listeria monocytogenes* may have invaded her central nervous system. Central nervous system involvement fit with Ms. Wall's overall clinical picture, which included significant neurological symptoms.

55.     After admission, Ms. Wall's condition gradually began to improve. By September 20, 2024, after two days of IV antibiotics, her headache and diarrhea were beginning to resolve, and her mental status was closer to baseline.

56.     On September 23, 2024, Ms. Wall was stable enough for discharge. Because of her immunocompromised state, Ms. Wall's infectious disease team recommended a four-week course (rather than the standard two-week course) of antibiotics. Before discharge, Ms. Wall's doctor inserted a midline catheter for administering her antibiotics.

57.      But, on or about October 17, 2024, the last day of her antibiotics course, Ms. Wall developed severe lower left abdominal pain and was soon back in the emergency department.

58.     Her care team suspected her pain was caused by a Crohn's flare, a known risk of prolonged interruption of her infliximab therapy, which had been suspended for approximately ten weeks because of her *Listeria* infection. (Infliximab therapy typically occurs every six weeks.)

59.     After thorough evaluation, Ms. Wall was discharged with instructions to eat a bland diet and follow-up with her primary care doctor.

60.     But Ms. Wall continued to experience intermittent abdominal pain, usually in the same spot. For Ms. Wall, this represented a significant setback in her Crohn's treatment, a setback that had a single root cause: her *Listeria monocytogenes* infection.

## COUNT I: STRICT PRODUCT LIABILITY – MANUFACTURING DEFECT

61.     Plaintiffs incorporate the preceding paragraphs by reference as if each paragraph were set forth here.

62.     Defendant Jack & the Green Sprouts grew, manufactured, processed, packaged, labeled, marketed, and sold the sprouts that caused Ms. Wall's injuries.

63. The sprouts manufactured and sold by Defendant Jack & the Green Sprouts that caused Ms. Wall's injuries were adulterated with *Listeria monocytogenes* and therefore were in a defective condition unreasonably dangerous for their ordinary and expected use by ordinary consumers.

64. The contaminated sprouts were unreasonably dangerous because they created a strong likelihood of injury to Ms. Wall if consumed in the normal manner.

65. Ordinary consumers, like Ms. Wall, cannot detect *Listeria* contamination.

66. Ms. Wall was not aware of the defect in Defendant's product at any time prior to her consumption of it.

67. The sprouts consumed by Ms. Wall were contaminated with *Listeria monocytogenes* when they left Defendant Jack & the Green Sprouts' control and reached Ms. Wall in substantially the same condition.

68. Ms. Wall used Defendant's product exactly as intended—eating without cooking soon after retail purchase.

69. As a legal and proximate cause of the defect of Defendant's product, Ms. Wall sustained the injuries and damages as set forth in the preceding paragraphs.

## COUNT II: NEGLIGENCE

70. Plaintiffs incorporate the preceding paragraphs by reference as if each paragraph were set forth here.

71. Defendant Jack & the Green Sprouts manufactured, processed, distributed, marketed, and sold sprouts that were contaminated with *Listeria monocytogenes*, a deadly pathogen.

72. Defendant Jack & the Green Sprouts owed a duty to all persons who consumed its products, including Ms. Wall, to manufacture and sell sprouts that were safe to eat, that were not adulterated with deadly pathogens like *Listeria monocytogenes*, and that were not produced in violation of applicable food safety regulations and industry standards.

10

73.     Defendant Jack & the Green Sprouts breached the duties owed to the consumers of its sprouts by committing the following negligent acts and omissions:

a.  Failing to adequately maintain and monitor the safety of its products, premises, equipment and employees;

b.  Failing to properly monitor and operate its growing operations, packing facilities and equipment in a safe, clean, and sanitary manner;

c.  Failing to adopt, implement, and follow adequate food safety policies and procedures;

d.  Failing to apply its food safety policies and procedures to ensure the safety and sanitary conditions of its food products, premises, and employees;

e.  Failing to adopt, implement, and validate food safety policies and procedures that met industry standards for the safe and sanitary production of produce;

f.  Failing to prevent the transmission of *Listeria monocytogenes* to consumers of its sprouts;

g.  Failing to properly train its employees and agents how to prevent the transmission of *Listeria monocytogenes*;

h.  Failing to properly supervise its employees and agents to prevent the transmission of *Listeria monocytogenes*;

i.  Failing to adequately test growing and processing facilities and its sprouts for microbial pathogens, including *Listeria monocytogenes*; and

j.  Other acts and omissions as revealed through discovery.

74.     Ms. Wall's injuries are a direct and proximate result of the negligence of Defendant Jack & the Green Sprouts.

75.     As a result of Defendant Jack & the Green Sprouts' negligence, Ms. Wall sustained the injuries and damages set forth in the preceding paragraphs.

## COUNT III: NEGLIGENCE *PER SE* (WIS. STAT. § 97.10)

76.    Plaintiffs incorporate the preceding paragraphs by reference as if each paragraph were set forth here.

77.    Defendant Jack & the Green Sprouts, its employees, agents, or those working on its behalf, as providers of food products within the State of Wisconsin, owe a duty to comply with Wis. Stat. Chapter 97.

78.    Wisconsin Food Law, Wis. Stat. § 97.10 *et seq.*, prohibits:

a.    The sale of any food that is adulterated or misbranded; and

b.    The manufacture, preparation for sale, storage, or sale of food that is not protected from contamination or unclean, unhealthful or insanitary conditions.

79.    Defendant Jack & the Green Sprouts, its employees, agents, or those working on its behalf, failed to comply with Wis. Stat. Chapter 97. Such conduct constitutes negligence *per se.*

80.    As a result of the failure of Defendant Jack & the Green Sprouts, its employees, agents, or those working on its behalf, to comply with Wis. Stat. Chapter 97, Ms. Wall sustained damages as set forth in the preceding paragraphs.

## COUNT IV: NEGLIGENCE *PER SE* (21 U.S.C. § 331)

81.    Plaintiffs incorporate the preceding paragraphs by reference as if each paragraph were set forth here.

82.    Defendant Jack & the Green Sprouts, its employees, agents, or those working on its behalf, as providers of food products in the United States of America, owe a duty to comply with 21 U.S.C. § 331, which states:

The following acts and the causing thereof are prohibited:

a.    The introduction or delivery for introduction into interstate commerce of any food that is adulterated;

b.    The receipt in interstate commerce of any food that is adulterated, and the delivery or proffered delivery thereof for pay or otherwise . . . .

12

83. Defendant Jack & the Green Sprouts, its employees, agents, or those working on its behalf, failed to comply with U.S.C. § 331. Such conduct constitutes negligence *per se.*

84. As a result of the failure of Defendant Jack & the Green Sprouts, its employees, agents, or those working on its behalf, to comply with 21 U.S.C. § 331, Ms. Wall sustained damages as set forth in the preceding paragraphs.

### COUNT V: BREACH OF IMPLIED WARRANTY

85. Plaintiffs incorporate the preceding paragraphs by reference as if each paragraph were set forth here.

86. The sprouts produced, distributed, and sold by Defendant Jack & the Green Sprouts that caused Ms. Wall's illness were adulterated with *Listeria monocytogenes* and were in a defective condition unreasonably dangerous to ordinary consumers and members of the public when they left Defendant Jack & the Green Sprouts' control.

87. Defendant Jack & the Green Sprouts violated Wisconsin Statutes § 402.314 because its goods: (a) would not pass without objection in the trade under the contract description; (b) were not of fair average quality within the description; and (c) were not fit for the ordinary purposes for which such goods are used: human consumption.

88. Ms. Wall's injuries are a direct and proximate result of Defendant Jack & the Green Sprouts' breach of implied warranties, and Ms. Wall is entitled to recover for all actual, consequential, and incidental damages that flow directly and in a foreseeable fashion from these breaches.

89. As a direct result of Defendant Jack & the Green Sprouts' breach of its implied warranties, Ms. Wall suffered the injuries and damages set forth in the preceding paragraphs.

### COUNT VI: LOSS OF CONSORTIUM

90. Plaintiffs reallege and incorporate the preceding paragraphs by reference as if each paragraph was set forth here.

91. At all relevant times, Plaintiff Steven Wall was and remains the lawful spouse of Plaintiff Jean Wall.

92. As a direct and proximate cause of Defendant Jack & the Green Sprouts' manufacture, distribution, and sale of sprouts contaminated with *Listeria monocytogenes* and its breach of its duties set forth above, Plaintiff Steven Wall has been deprived of, and will continue to be deprived of in the future, the services, aid, comfort, society, companionship, and conjugal affections of his spouse, Plaintiff Jean Wall.

## PUNITIVE DAMAGES

93. Plaintiffs incorporate the preceding paragraphs by reference as if each paragraph were set forth here.

94. The above-described conduct of the Defendant was unlawful, extreme, malicious, outrageous, and/or intentional.

95. Such conduct was a cause of the physical, psychological, and emotional personal injuries suffered by Ms. Wall.

96. At all relevant times, Defendant acted maliciously and/or with reckless disregard and/or with deliberate indifference toward Ms. Wall or in an intentional disregard of her rights, such as to subject the Defendant to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendant and request compensatory damages, together with interest, cost of suit, attorneys' fees, and all other relief as the Court deems just and proper as well as:

    A. Compensatory damages in excess of the minimum jurisdictional amount, including, but not limited to, compensation for injury, pain, suffering, mental anguish, emotional

distress, loss of enjoyment of life, and other non-economic damages to be determined by the trier of fact in this action;

B.  Economic damages in the form of medical expenses, out-of-pocket expenses, and other economic damages in an amount to be determined by the trier of fact in this action;

C.  Attorneys' fees, expenses, and other costs of this action;

D.  Punitive damages; and

E.  Such relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial.

Dated: June 1, 2026

Respectfully Submitted,

OFT LAW PLLC

By:  ____s/Brendan Flaherty____
Brendan Flaherty (MN Bar No. 0327657)
800 LaSalle Ave. Suite 2260
Minneapolis, MN 55402
brendan@oftlaw.com

Bart B. Torvik
701 Main Street, Suite 204
Evanston, Illinois 60202
bart@oftlaw.com

Phone: 888-828-7087
Fax: 888-239-0559

*Attorneys for Plaintiffs*